UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

<u>United States of America</u>

    v.                              Criminal No. 14-cr-104-LM-1
                                         Opinion No. 2020 DNH 143

<u>Roger Perkins</u>

# **O R D E R**

In this case, the court recommends to the Bureau of Prisons (BOP) that it exercise its discretion to release defendant to home confinement on a temporary basis.  The release would last for the duration of the national emergency declared as a result of the COVID-19 pandemic.  Defendant has served almost 60% of his 12-year federal sentence for serious crimes.  Defendant qualifies for release to home confinement on a temporary basis because of the high likelihood that defendant will die (or suffer severe illness) were he to contract COVID-19 while incarcerated.  In addition, despite his criminal record, defendant appears to be a low risk for dangerousness if released under strict supervision.  BOP has rated defendant a low risk for violence and has housed him in a low security prison facility.

The court sentenced defendant to a lengthy term of incarceration.  The court did not intend, however, that defendant suffer the very real risk of death while serving that sentence.  A court does not have the power to release a

defendant on a temporary or furloughed basis.  Rather, pursuant to a court's "compassionate release" order, a defendant typically receives a "time served" sentence and is released to home confinement for the remainder of his original sentence.

Were the court to grant compassionate release in this case, defendant would serve the approximately four years remaining on his prison sentence at home.[1]  It appears unlikely, however, that the pandemic will last four more years.  Should a successful vaccine be developed within the next year, for example, defendant would remain on release——pursuant to a court's compassionate release order——despite the elimination of the reason for his early release.  This defendant serving 60% of his original sentence is a result at odds with the goals of sentencing, particularly the goal of promoting respect for the law.

There is an answer to this dilemma.  BOP has the power to release this defendant to home confinement for a limited time: the duration of the national emergency.  At the end of the pandemic, BOP may order defendant to return to prison to serve out the remainder of his original sentence.  The court urges BOP to exercise its power in this manner rather than cede this decision to the court.

---

[1] Defendant has only four years left on his sentence as a result of anticipated "good time" credits.

For the reasons explained below, a release to last only for the duration of the pandemic is consistent with all of the goals of sentencing.

## BACKGROUND

On July 21, 2015, defendant, Roger Perkins, pleaded guilty to three charges: one count of conspiracy to possess with intent to distribute 28 grams or more of cocaine base (crack) in violation of 21 U.S.C. §§ 841(a), 841(b)(1)(B)(iii), and 846; one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1); and one count of possessing a firearm in furtherance of a drug-trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i).  On November 3, 2015, the court sentenced defendant to 147 months of imprisonment—87 months on counts 1 and 2 to be served concurrently and 60 months on count 3 to be served consecutively to counts 1 and 2—and five years of supervised release.

Defendant now moves for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A), based on the threat posed to his health by the combination of his underlying medical conditions and the spread of COVID-19 in the Federal Correctional Institution ("FCI") Danbury where he is incarcerated.  The government concedes that defendant has exhausted his administrative remedies as required by § 3582(c)(1)(A), but

objects to his release.  The court held a telephonic hearing on defendant's motion on July 23, 2020, at which defendant was present.

**STANDARD OF REVIEW**

A court may grant so-called "compassionate release" to a defendant under 18 U.S.C. § 3582(c)(1)(A).  The statute provides, in relevant part, that:

> [T]he court, upon motion of the Director of the Bureau of Prisons or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i)  extraordinary and compelling reasons warrant such a reduction
>
> . . .
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

18 U.S.C. § 3582(c)(1)(A); see also U.S.S.G. § 1B1.13 (sentencing guidelines policy statement on compassionate release).

Where, as here, a motion for compassionate release is properly before the court, the court must determine if defendant

is eligible for release.  The statutory language quoted above requires that defendant show that "extraordinary and compelling reasons warrant" a reduction in his sentence, that the court consider the factors set forth in 18 U.S.C. § 3553(a) to the extent applicable, and that the reduction be "consistent" with the Sentencing Commission's applicable policy statements.  18 U.S.C. § 3582(c)(1)(A).  The Sentencing Commission's policy statement regarding compassionate release mirrors the statutory language and adds the requirement that the court find that the defendant is not likely to pose a danger to the safety of any other person or to the community as provided in 18 U.S.C. § 3142(g).  See U.S.S.G. § 1B1.13(2).  A defendant's dangerousness is a paramount concern as a court weighs the decision to grant a defendant early release.  See United States v. Bradshaw, No. 1:15-CR-422, 2019 WL 7605447, at *3 (M.D.N.C. Sept. 12, 2019) (explaining overlap between dangerousness requirement in compassionate release policy statement and § 3553(a) requirement that court consider the need to protect the public).

In short, a court may reduce a term of imprisonment under the compassionate release provision if it: (1) finds that extraordinary and compelling reasons warrant the reduction; and (2) considers the sentencing factors outlined in 18 U.S.C. § 3553(a).  See 18 U.S.C. § 3582(c)(1)(A); U.S.S.G. § 1B1.13; see also United States v. Rasberry, No. 2:15-CR-00127-JDL, 2020 WL

3977614, at *1 (D. Me. July 14, 2020); United States v. Hilow, No. 15-CR-170-JD, 2020 WL 2851086, at *1 (D.N.H. June 2, 2020). The defendant bears the burden of showing that he is entitled to a sentence reduction.  Hilow, 2020 WL 2851086, at *3.  And the court has "broad discretion in deciding whether to grant or deny a motion for sentence reduction."  United States v. Britton, Crim. No. 18-cr-108-LM, 2020 WL 2404969, at *2 (D.N.H. May 12, 2020) (internal quotation marks omitted).

**DISCUSSION**

I.  Extraordinary and Compelling Reasons

It is undisputed that defendant has several co-occurring medical conditions that put him at high risk for severe illness or death should he contract COVID-19, including morbid obesity, hypertension, obstructive sleep apnea, and several other less serious, but chronic, conditions.  Defendant has submitted medical records evidencing these diagnoses.  See doc. no. 80-8.[2] He argues that his health conditions combined with the known presence of COVID-19 at FCI Danbury constitute extraordinary and compelling reasons supporting his release.  The government concedes that defendant is morbidly obese, that this diagnosis places him in a high-risk category under the Centers for Disease

_____

[2] Defendant filed an assented-to motion to seal those medical records (doc. no. 82).  The court grants that motion.

Control and Prevention ("CDC") guidelines, and that he has therefore established extraordinary and compelling reasons. Although this point is not disputed, the court will discuss it briefly to emphasize the <u>severity</u> of the risk to defendant's health.

In the context of the current pandemic, courts have held that a generalized risk of infection by the virus is not, by itself, sufficient to constitute an extraordinary and compelling reason warranting release.  See <u>United States v. Ramirez</u>, No. CR 17-10328-WGY, 2020 WL 2404858, at *3 (D. Mass. May 12, 2020) (collecting cases).  "On the other hand, a combination of health and age factors that put a prisoner at a substantially higher risk due to COVID-19 along with a documented risk of the disease in the facility where the prisoner is incarcerated may demonstrate extraordinary and compelling reasons to reduce the prisoner's sentence." <u>United States v. Bischoff</u>, No. 17-CR-196-JD, 2020 WL 2561423, at *2 (D.N.H. May 19, 2020) (collecting cases in support); <u>see also, e.g.</u>, <u>United States v. Rich</u>, Crim. No. 17-cr-094-LM, 2020 WL 2949365, at *3-4 (D.N.H. Jun. 3, 2020) (finding that defendant's documented history of bronchitis, reactive airway disease, and smoking combined with current outbreak at the prison constituted extraordinary and compelling reason).

When determining whether a defendant is at a particularly high risk of experiencing severe illness from COVID-19, courts have generally looked to the CDC guidelines.  See, e.g., United States v. Nygren, No. 1:16-CR-00106-JAW, 2020 WL 4208926, at *11-12 (D. Me. July 22, 2020); Rasberry, 2020 WL 3977614, at *3-4.  The CDC emphasizes that "COVID-19 is a new disease" and that there is "limited data and information about the impact of underlying medical conditions and whether they increase the risk for severe illness from COVID-19."[3]  Based on the limited information known, the CDC has identified certain categories of people who are at an increased risk for experiencing severe illness from COVID-19: older adults and people of all ages with certain underlying medical conditions.[4]  The CDC classifies obesity—defined as having a body mass index ("BMI") of 30 or above—as an underlying health condition that puts the individual at "increased risk of severe illness from COVID-19."[5]

---

[3] CDC, People With Certain Medical Conditions, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html, (last visited July 27, 2020).

[4] CDC, People Who Are at Increased Risk for Severe Illness, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-increased-risk.html, (last visited July 29, 2020).

[5] CDC, People With Certain Medical Conditions, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-

A number of recent studies have further investigated the link between obesity and severe illness and death from COVID-19.[6] One study discovered an "increasing risk of death with degree of obesity."[7]  In other words, the higher a person's BMI is, the greater the risk that COVID-19 will prove fatal for that person.[8] Another recent study of nearly 7,000 COVID patients found that obesity is associated with a 2-4 times greater risk of death,

---

precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html, (last visited July 27, 2020).

[6] See, e.g., Roni Caryn Rabin, The New York Times, Obesity Linked to Severe Coronavirus Disease, Especially for Younger Patients, https://www.nytimes.com/2020/04/16/health/coronavirus-obesity-higher-risk.html, (published Apr. 16, 2020; last visited July 28, 2020).

[7] The OpenSAFELY Collaborative, OpenSAFELY: factors associated with COVID-19-related hospital death in the linked electronic health records of 17 million adult NHS patients, https://www.medrxiv.org/content/10.1101/2020.05.06.20092999v1.full.pdf+html, (posted May 7, 2020).

[8] See also Natasha N. Pettit, et al., Obesity, Obesity Associated with Increased Risk for Mortality Among Hospitalized Patients with COVID-19, https://onlinelibrary.wiley.com/doi/epdf/10.1002/oby.22941, (published online Jun. 26, 2020) ("[O]besity was significantly associated with mortality after adjusting for age, gender, and other comorbidities.  For every increase from one BMI category to the next, there was a 70% increased odds of mortality in the multivariable model."); Feng Gao, et al., Diabetes Care, Obesity Is a Risk Factor for Greater COVID-19 Severity, https://care.diabetesjournals.org/content/early/2020/05/12/dc20-0682, (published online May 14, 2020) ("[T]he presence of obesity was associated with an approximately threefold increased risk of having severe COVID-19 . . . [e]ach 1-unit increase in BMI was associated with a 12% increase in the risk of severe COVID-19.").

especially for men and all people under 60 years old.[9]  Further illustrating this point, the CDC recently published a graphic explaining that severe obesity (BMI > 40) increases a person's risk of hospitalization from COVID-19 by 4.5 times as compared to a person without that health condition.[10]



Defendant's BOP medical records indicate that defendant has a body mass index of 62.6.  Doc. no. 80-8 at 1, 64.  Defendant's BMI is twice the obesity threshold BMI of 30 and well above the

---

[9] Sara Y. Tartof, et al, Annals of Internal Medicine, <u>Obesity and Mortality Among Patients Diagnosed With COVID-19: Results From an Integrated Health Care Organization</u>, https://www.acpjournals.org/doi/10.7326/M20-3742, (published online Aug. 12, 2020; last visited Aug. 14, 2020).

[10] CDC, <u>COVID-19 Associated Hospitalizations Related to Underlying Medical Conditions</u>, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-underlying-medical-conditions.html (last visited Aug. 13, 2020).

40 BMI threshold for "severe obesity" set by the CDC.  Thus, defendant's degree of obesity puts him at an extraordinarily high risk of experiencing complications or death should he become infected with COVID-19.

Additionally, defendant suffers from at least one other high-risk medical condition: hypertension.  Doc. no. 80-8 at 63. The CDC guidelines explain that having hypertension "might" put the individual at an increased risk for severe illness from COVID-19.[11]  The fact that defendant has at least two co-existing high-risk conditions further increases his risk because "[t]he more underlying medical conditions someone has, the greater their risk is for severe illness from COVID-19."[12]  Considering all these facts, the court finds that defendant's hypertension and extreme degree of obesity put him at grave risk of experiencing severe illness or death should he become infected with COVID-19.

---

[11] CDC, People With Certain Medical Conditions, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html, (last visited July 27, 2020).

[12] CDC, People With Certain Medical Conditions, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html, (last visited July 27, 2020).

The court also finds that defendant's risk of becoming infected with COVID-19 is more than speculative. Many courts, including this one, have recognized that the nature of the prison environment itself enhances the likelihood that prisoners will catch this highly contagious virus. See Gomes v. US Dep't of Homeland Sec., Acting Sec'y et. al., No. 20-CV-453-LM, 2020 WL 2514541, at *4 (D.N.H. May 14, 2020); Bischoff, 2020 WL 2561423, at *2 (collecting cases). That is especially true where there is already a documented outbreak at the prison. FCI Danbury experienced a serious outbreak of COVID-19 several months ago and, as of August 17, at least one staff member at the facility was positive for the virus. See Martinez-Brooks v. Easter, ___ F. Supp. 3d ___, 2020 WL 2405350, at *20 (D. Conn. May 12, 2020) (class action habeas suit on behalf of all inmates at FCI Danbury, alleging a claim of deliberate indifference against BOP for failure to use all available avenues to reduce prison population to protect against COVID-19); BOP, COVID-19, https://www.bop.gov/coronavirus/, (Danbury FCI Facility) (last visited August 17, 2020). For these reasons, the court finds that the "extraordinary and compelling reasons" prong weighs heavily in favor of defendant's release.

II.  Sentencing Factors

Next, the court must consider whether a reduction in defendant's sentence would be consistent with the sentencing

factors outlined in 18 U.S.C. § 3553(a) to the extent they are applicable.  See 18 U.S.C. § 3582(c)(1)(A).  The § 3553(a) factors a court must consider at sentencing include the nature and circumstances of the defendant's offense and the defendant's personal history and characteristics.  18 U.S.C. § 3553(a)(1). Section 3553(a) requires that the court ensure that the sentence imposed reflects the seriousness of the offense that was committed, promotes respect for the law, provides just punishment, affords adequate deterrence, protects the public from further crimes of the defendant, and provides the defendant with needed training, medical care, and other treatment in the most effective way.  18 U.S.C. § 3553(a)(2).  Section 3553(a) further requires the court consider the kinds of sentences available, the Sentencing Guidelines, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to any victims.  18 U.S.C. § 3553(a)(3)-(7).

The court assesses the relevant sentencing factors below. After considering the applicable § 3553(a) factors, the court will consider whether those factors support a reduction in defendant's sentence, or, alternatively, whether they outweigh the "extraordinary and compelling reasons" discussed above and compel denial of the motion.  See, e.g., United States v. Tidwell, ___ F. Supp. 3d ___, 2020 WL 4504448, at *6 (E.D. Pa.

Aug. 5, 2020); United States v. Daugerdas, ___ F. Supp. 3d ___,
2020 WL 2097653, at *4 (S.D.N.Y. May 1, 2020).

A. Need to Protect the Public and Nature and Circumstances
   of Offense

There is no doubt that defendant has a troubling criminal
history.  Defendant's difficult and unstable homelife during
childhood contributed to a series of juvenile convictions.  And,
between the ages of 19 and 21, defendant was convicted of a
variety of state misdemeanor offenses.

In 2005, when defendant was 22, he was convicted of his
first felony, a state charge of possession of cocaine for which
he served 2.5 years in state prison.  At age 25, defendant
pleaded guilty to another felony——a second-degree assault charge
that occurred prior to his incarceration on the drug charge.
Although a serious charge, the court sentenced defendant to two
to four years imprisonment but deferred the sentence for two
years contingent on his good behavior and agreed to suspend the
sentence for three additional years on defendant's good
behavior.  Defendant complied with the conditions for deferral
and suspension of his sentence.[13]  Because defendant remained of

_____

[13] This felony offense involved a minor victim and was
originally charged as a sexual assault.  Defendant maintained
his innocence on that charge and a jury trial ended in a
mistrial.  After the trial, the sexual assault charges were nol
prossed and the defendant pleaded guilty to a reduced charge,
second degree assault.  During the hearing on this motion,
defense counsel explained that defendant pleaded guilty as part

14

good behavior for 5 years the sentence was never imposed. Additionally, while on parole from his felony drug charge, defendant committed no parole violations and his sentence was successfully discharged in 2011.  Based on this criminal record, defendant was a criminal history category of III under the Sentencing Guidelines.

In March 2014, defendant committed the instant federal offenses.  Defendant's federal offenses are very serious.  He participated in a drug-trafficking conspiracy, selling crack and powder cocaine, and smaller amounts of Psilocin mushrooms, MDMA, and marijuana.  When officers arrested defendant in connection with the drug conspiracy, they found four firearms, which were stored either near or inside two safes filled with drugs and cash.  Three of those firearms were loaded when found, and one had been reported stolen.  When asked by law enforcement to whom the items in the safe (including the firearms) belonged, defendant immediately claimed ownership.  This conduct—especially defendant's possession of firearms after being

---

of a compromise where the government both reduced the charge and agreed to recommend a non-incarcerative sentence.  The presentence investigation report indicates that evidence of defendant's innocence surfaced <u>after</u> he served his sentence for this conviction.  Specifically, the record indicates that, after defendant served the sentence on the charge, the minor victim's aunt (to whom the victim first disclosed the alleged assault) reported to the victim/witness advocate that the actual perpetrator was the victim's father—not the defendant.

convicted of a felony and in furtherance of a drug-trafficking crime—is most concerning in terms of defendant's dangerousness.

Importantly, however, defendant has no history of having used a firearm (or other weapon) to harm or threaten to harm another person.  Defendant's possession of guns while dealing drugs did not cause the prison to rate him either a "high" or "moderate" risk for violence.  Rather, the prison gave him a "low" PATTERN score for violence, meaning the prison assesses defendant as having a low likelihood of reoffending in a violent manner.[14]  Consistent with that rating, BOP has housed defendant in a low security prison.

 Although defendant's criminal record is troubling, defendant's behavior while under supervision and his history of cooperating with law enforcement both mitigate his dangerousness.  Defendant completed a 2.5-year term of state parole without a single violation.  And defendant remained of good behavior for approximately five years on a state sentence that was deferred and then suspended by the court. Additionally, defendant has a history of taking responsibility for his conduct and cooperating with law enforcement.  He is not a defendant who contests his guilt or tries to shift blame to

---

[14] "PATTERN" stands for Prisoner Assessment Tool Targeting Estimated Risk and Needs.  An inmate's PATTERN score is assigned by BOP.  Due to defendant's criminal record, he has an "overall" PATTERN score of "medium."

others.  Defendant acted similarly with respect to his federal
offenses.  When officers asked defendant and his co-defendant to
whom the items in the two safes belonged, defendant immediately
admitted ownership.  Defendant then accepted responsibility for
his criminal conduct, and pleaded guilty to the federal
offenses.

    Also indicative of defendant's low risk of dangerousness is
his good behavior while incarcerated.  Defendant committed no
disciplinary infractions while detained in state custody pending
sentencing, and during his approximately five years of federal
incarceration, defendant has committed only two minor
disciplinary infractions.  He has also used his time in prison
productively by engaging in rehabilitative and educational
programs.  He participated in a drug education class, Alcoholics
Anonymous, and Narcotics Anonymous.  He represents that he has
been on the waiting list for the Residential Drug Abuse
Treatment Program ("RDAP") for several years but has not been
enrolled yet based on how much of his sentence remains.
Defendant has also completed a wide variety of vocational and
educational programs while incarcerated to make himself more
employable upon release.

    In this case, a "compassionate release" would not mean that
defendant would be released from BOP custody a free man.
Rather, defendant would be released on home confinement and

under strict supervision.  Importantly, the record is clear
that, while under supervision, defendant has an excellent
history of compliance.  Although defendant's criminal history
does not weigh in favor of release, defendant's record of good
behavior while under supervision is a counter-balance,
especially considering that he would be under strict supervision
for a lengthy period of time if released.

Based on defendant's excellent history of compliance with
conditions while under supervision, his history of cooperation,
his efforts to rehabilitate himself, and the prison's assessment
of his dangerousness, the court finds that with the proper
release conditions defendant is not likely to be a danger to the
safety of any other person or to the community if released.  Cf.
Delacruz v. United States, Civ. No. 18-cv-811-LM, 2020 WL
3270503, at *4-5 (D.N.H. Jun. 17, 2020) (denying compassionate
release where defendant's career offender status resulted in the
highest criminal history category, VI, defendant served seven
years in state prison for state felony drug-trafficking crimes
which did not deter him from committing federal drug-trafficking
offenses, and defendant provided false information to law
enforcement upon arrest).

B. Seriousness of the Offense, Adequate Deterrence, Respect
   for the Law, and Just Punishment

The goal of public protection, although paramount, is not
the only consideration.  The court must also consider, if
relevant, whether a reduction in defendant's sentence would
sufficiently reflect the seriousness of the offense, afford
adequate deterrence, promote respect for the law, and provide
just punishment.  See 18 U.S.C. § 3553(a)(2).  Defendant has
served about 60 percent of his 12-year sentence: he has been
detained since August 28, 2014 (nearly 6 years) and his
projected release date is approximately 4 years away in August
2024, assuming good time credit.  The court ruled at defendant's
sentencing hearing that 12 years in prison was a just punishment
for his crimes.  A release four years early would not promote
respect for the law.  This is especially a concern where it
appears that the reason for the release (the national emergency)
is unlikely to last four years.

C. Weighing the Sentencing Factors Against the Extraordinary
   and Compelling Reasons

Finally, the court weighs the sentencing factors against
the strength of defendant's extraordinary and compelling reasons
for release.  See Tidwell, 2020 WL 4504448, at *6; Daugerdas,
2020 WL 2097653, at *4.  Weighing most heavily in favor of a
reduction in defendant's sentence are defendant's extraordinary
and compelling reasons for release.  The court is concerned that

requiring defendant to stay in BOP custody during the pandemic may well amount to a death sentence.  And, although defendant's release poses a risk that he will reoffend, the court finds that that risk is counterbalanced by a low likelihood of dangerousness if defendant is released on strict conditions.

A permanent early release, however, does not adequately account for the goals of promoting respect for the law and providing just punishment.  A release for the duration of the pandemic, and a return to serve the remainder of his sentence thereafter, would address all of the goals of sentencing.  As will be explained in more detail below, the court lacks authority to temporarily release, or furlough, a defendant during the pandemic.  See United States v. Roberts, No. 18-CR-528-5 (JMF), 2020 WL 1700032, at *3 (S.D.N.Y. Apr. 8, 2020) (collecting cases).  But BOP has that power.  See id.

BOP has two sources of statutory authority under which it could effectuate defendant's release: its home confinement authority under 18 U.S.C. § 3642(c)(2); and its authority to temporarily release a prisoner under 18 U.S.C. § 3622.

First, pursuant to 18 U.S.C. § 3624(c)(2), BOP has the authority "to place a prisoner in home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months." 18 U.S.C. § 3624(c)(2).  Under this provision, Perkins would not typically be eligible for home

confinement at this point in his sentence.  But Congress recently amended the time restrictions of § 3624(c)(2) in the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act").  That amendment gave Attorney General Barr the power to "lengthen the maximum amount of time for which the Director [of BOP] is authorized to place a prisoner in home confinement." Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 236 (March 27, 2020).  Attorney General Barr has directed BOP to utilize this expanded home confinement authority to protect vulnerable inmates and prevent or control the spread of the virus.[15]

Specifically, in March, prior to passage of the CARES Act, Attorney General Barr directed BOP to "prioritize the use of [BOP's] various statutory authorities to grant home confinement to inmates" to protect the health of vulnerable inmates during the pandemic.[16]  In April, after passage of the CARES Act, Attorney General Barr directed BOP to "immediately review all inmates who have COVID-19 risk factors, as established by the CDC" in order to evaluate those inmates for potential release

---

[15] Atty. Gen. William Barr, Increasing Use of Home Confinement at Institutions Most Affected by COVID-19, (Apr. 3, 2020), https://www.justice.gov/file/1266661/download.

[16] See Atty. Gen. William Barr, Prioritization of Home Confinement as Appropriate in Response to COVID-19 Pandemic (Mar. 26, 2020), https://www.bop.gov/resources/news /pdfs/20200405_covid-19_home_confinement.pdf.

under the expanded home confinement authority.[17]  He ordered BOP
to start that review process at several facilities experiencing
severe outbreaks—one of which was FCI Danbury.  In assessing
which inmates should be released to home confinement, Attorney
General Barr directed BOP to consider "the totality of
circumstances" regarding each inmate, including the "danger
posed by the inmate to the community" and "[t]he age and
vulnerability of the inmate to COVID-19, in accordance with the
[CDC] guidelines."[18]

The court is aware that BOP has reviewed defendant for
possible release under its expanded home confinement authority.
BOP identified defendant's obesity as a COVID risk factor, but
ultimately found him ineligible for release to home confinement
due to the nature of his federal offenses and his criminal
history.  BOP's assessment itself is flawed and contains
inaccurate information.  A significant reason listed for denial
is defendant's "conviction" for "Aggravated Felonious Sexual
Assault."  Defendant was never convicted of this charge.  The
charge was nol prossed after a jury trial ended in a mistrial.
And the government offered defendant a nonincarcerative sentence

---

[17] Atty. Gen. William Barr, Increasing Use of Home
Confinement at Institutions Most Affected by COVID-19, (Apr. 3,
2020), https://www.justice.gov/file/1266661/download.

[18] Id.

if he pleaded to a lesser charge: second-degree assault.
Defendant took the deal.  After he pleaded guilty, however,
evidence surfaced that defendant was innocent of the charge.
Based on its flawed internal review, the BOP also inaccurately
labeled defendant a "sex offender."

BOP did not carefully review defendant's criminal history.
This is troubling considering the reason for the review is to
assess defendant's eligibility for release due to the dangers
that COVID-19 may pose to him. As the court has already
explained, the dangers to this defendant are grave.  The court
urges BOP to reconsider its original assessment of defendant,
and, in doing so, expunge from defendant's internal BOP records
the inaccurate characterization of his criminal history.

The decision whether to release defendant on home
confinement under § 3642 is completely within BOP's discretion—
even under the CARES Act.  See 18 U.S.C. §§ 3621(b), 3624(c)(2);
Tapia v. United States, 564 U.S. 319, 331 (2011); United States
v. Barnes, No. 16-20308, 2020 WL 2733885, at *2 (E.D. Mich. May
26, 2020).  The court may, however, make a judicial
recommendation to BOP that a defendant be placed on home
confinement.  See 18 U.S.C. § 3621(b)(4); United States v.
Doshi, No. 13-CR-20349, 2020 WL 1527186, at *1 (E.D. Mich. Mar.
31, 2020); United States v. Best, No. 5:16-CR-236-FL, 2019 WL
5608856, at *1 (E.D.N.C. Oct. 30, 2019).  The court makes a

judicial recommendation that BOP reconsider its prior assessment of defendant's eligibility for release to home confinement.

Second, independent of its home confinement authority as expanded under the CARES Act, BOP is authorized to temporarily release an inmate under 18 U.S.C. § 3622.  Pursuant to that statute, BOP:

> may release a prisoner from the place of his imprisonment for a limited period if such release appears to be consistent with the purpose for which the sentence was imposed and any pertinent policy statement . . . if such release otherwise appears to be consistent with the public interest and if there is reasonable cause to believe that a prisoner will honor the trust to be imposed in him, by authorizing him, under prescribed conditions, to—
>
> (a) visit a designated place for a period not to exceed thirty days, and then return to the same or another facility, for the purpose of-
>
>> . . .
>>
>> (3) obtaining medical treatment not otherwise available;
>>
>> . . . or
>>
>> (6) engaging in any other significant activity consistent with the public interest . . . .

18 U.S.C. § 3622(a).

At least one court has concluded that either of the purposes listed above would be sufficient to justify the temporary release of an inmate with high-risk medical conditions during this pandemic.  See Roberts, 2020 WL 1700032, at *3.

And, in Roberts, the government conceded that, in the context of the pandemic, a temporary release could be extended beyond the 30 days specified in the statute. Id. Specifically, the government conceded that BOP could release the defendant until such time as the threat posed by COVID-19 subsided, and the defendant could safely return to prison to finish her sentence. Id.

In this case, defendant's temporary release during the pandemic would balance the need to protect defendant's health with the need to promote respect for the law and provide just punishment. The discretion to grant defendant temporary release, however, lies in the sole discretion of BOP, not with this court. See 18 U.S.C. § 3622; Roberts, 2020 WL 1700032, at *3 (collecting cases). Although the court lacks the authority to temporarily release defendant, it may provide a judicial recommendation to BOP for defendant's temporary release. See Roberts, 2020 WL 1700032, at *4. For all the reasons explained above that favor defendant's release—namely the severe risk to his health posed by COVID-19 and his low risk for dangerousness— the court recommends that BOP temporarily release defendant during the course of the COVID-19 pandemic. See United States v. Trinh, No. 217CR287JCMVCF, 2020 WL 3129024, at *3 (D. Nev.

June 12, 2020) (recommending that BOP temporarily release defendant where health issues put defendant at high risk).[19]

In sum, while a BOP decision to release this defendant for the duration of the pandemic would serve all the goals of sentencing, a court's compassionate release order would fall short of serving the goals of promoting respect for the law and providing just punishment for defendant's crimes. However, if BOP fails to exercise its discretion to release this defendant on a temporary basis, the court will revisit its consideration of the goals of sentencing. A death sentence is neither a just sentence nor one that would promote respect for the law.

## CONCLUSION

For these reasons, the court denies defendant's motion for compassionate release (doc. no. 80) without prejudice to refile the motion in thirty (30) days should BOP fail to take action consistent with this opinion.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

August 18, 2020
cc:  Counsel of Record.

---

[19] Defendant has also proposed a suitable release plan. He proposes to reside with his wife and their children in Massachusetts, where community transmission of the virus is limited as compared with other areas of the country. See The New York Times, Coronavirus in the U.S.: Latest Map and Case Count, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last visited Aug. 13, 2020).